**M. L. DUNKIN and Shirley Dunkin, a Partnership, Plaintiffs,**

v.

**FROEHDE MOBILE HOMES, INC., Defendant.**

**Civ. A. No. 7706.**

United States District Court

D. South Carolina, Charleston Division.

Nov. 3, 1966.

See also D.C., 208 F.Supp. 1.

Henry B. Smythe, Buist, Buist, Smythe & Smythe, Charleston, S. C., for plaintiff.

Edward D. Buckley, Bailey & Buckley, Charleston, S. C., Myrl O. Wilkinson, Dix, Dix, Patrick, Ratcliffe & Adamson, Terre Haute, Ind., for defendant.

## ORDER

SIMONS, District Judge.

This is an action by the plaintiffs herein against the defendant, an Indiana corporation, for an accounting and a monetary judgment. In its answer defendant set up a counterclaim asking for judgment against plaintiffs. This matter is before the court on exception to the report of the late James B. Heyward, Standing Master of this court, dated November 16, 1964.

This suit was commenced in 1962 by M. L. Dunkin and Shirley Dunkin who were husband and wife. Defendant thereupon moved to quash the service of process which was denied by order of the late Judge C. C. Wyche of this court on August 24, 1962. Over the further objection of defendant corporation this matter was referred by Judge Martin to the Standing Master "to take testimony and to report his findings of fact and recommendations of law, with leave to report any special matter".

The report of the Master recommended judgment for the plaintiffs in the sum of $49,082.00.[1] Under the provisions of Rule 53(e)(2) of the Federal Rules of Civil Procedure "the court shall accept the Master's findings of fact unless clearly erroneous * * * the court, after hearing, may adopt the report or may modify it or may reject it in whole or in part, or may receive further evidence or may recommit it with instructions." Consistent therewith the court does reject and hereupon modifies the Master's report, and in accordance with Rule 52 of the Federal Rules of Civil Procedure, the court specially sets forth its findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Prior to 1955, plaintiff M. L. Dunkin was employed by the defendant, a mobile home retail sales corporation, on a commission basis to manage its South Carolina operation. Early in 1955 the defendant through its president, Pete Froehde, entered into an agreement with M. L. Dunkin whereby Dunkin instead of being employed on a salary basis would retain 50% of the net profit of the location that he managed. The only written evidence of this agreement is plaintiffs' Exhibit 11 which is a note to M. L. Dunkin written in longhand and signed by George Heatter, who is an employee of the defendant. This note reads as follows:

> "Attached is adjustment of repos that were sold before you went on the 50% of the net basis.

> "Your deal as Pete explained to me is 50% of the net profit after all expense including interest at ½% per month on the average value of your new trailer inventory. The reserve is set up at 3% of the unpaid balance (selling price less downpayment).

> "Geo."

2. On August 21, 1956 the two plaintiffs and the defendant entered into a written agreement entitled "Manager's Reserve Agreement" which is plaintiffs' Exhibit 1. This agreement reads as follows:

> "This agreement entered into this 21st day of August AD, 1956, between Froehde Mobile Homes, Inc., a corporation, and M. L. Dunkin and Shirley Dunkin, as Partnership, shall establish the method of setting up and releasing their manager's reserve account.

> "The manager's reserve, which is 3% of the sum of principal balances of all contracts financed, has been and shall be setup on a monthly basis.

> "The reserve shall be held for a period of 36 months. At the end of 36 months, the amount of reserve setup

---

**1.** The Master, in his report of November 16, 1964, found "that the plaintiffs should be entitled to a judgment against the defendant in the amount of Forty-nine Thousand Eighty-two and no/100 ($49,082.00) Dollars, such having been arrived at by deducting from Sixty-six Thousand Fifty-four and 55/100 ($66,054.55) Dollars the amount of the over draft of his reserve and the proceeds he received from the sale of the Mobile Homes, which he retained." (See page 6.)

in any one month, less 50% of any loss created by repossession of an account originally financed during the month the reserve was setup, shall be paid upon request. In the event M. L. Dunkin and Shirley Dunkin terminate their employment with Froehde Mobile Homes, Inc., they shall have the option of purchasing any trailer respossed (sic) after that event at the net balance due. If they do not exercise this option, then, any loss created by such repossession will be deducted from their reserve account.

"In the event of financing for a term exceeding sixty months, reserve for such longer contracts shall be set-up separately and the method for releasing them shall be determined by the experience developed with said accounts.

"FROEHDE MOBILE HOMES, INC.
By: Pete Froehde        President
        M. L. Dunkin
        Shirley Dunkin"
"Witnesseth:
George E. Heatter"

3. In September of 1958 the Froehde operation in South Carolina was sold; as of this date new mobile home sales ceased and the parties commenced winding up the business in South Carolina.

4. From 1955 to 1958 plaintiffs were operating as many as five mobile homes sales lots in South Carolina for the defendant. Plaintiffs had salesmen and servicemen on each of these lots and maintained their headquarters at a North Augusta location where they had two salesmen, two servicemen and an office girl. Payroll and payroll records for all of these persons were maintained at Terre Haute, Indiana by defendant, and all checks were issued from there. All new mobile home inventory purchases were handled by the home office in Terre Haute, and all books and records on the operation were kept there. Although some items of expense were paid in South Carolina through various petty cash funds at the various locations, all other expenses were taken care of by the Terre Haute office.

5. Quarterly statements of the business were furnished plaintiffs by Froehde during this period. The statement of April 19, 1956, showed a computation allocating home office administration expenses incurred in Terre Haute which were charged to the South Carolina operations in the amount of $11,-463.62. Mr. Dunkin at this time objected to this item of expense as being excessive. Defendant continued to furnish Dunkin with quarterly statements of the operations throughout 1956 and in April 1957 sent the annual statement, which like the 1955 statement, contained an adjustment for home office administrative expense in the amount of $8,603.38. Dunkin again objected to charging his operation with such administrative expense item. Thereafter defendant did not charge any portion of said home office administrative expenses against the South Carolina operations.

6. Defendant attempts to justify the portion of the administrative expenses charged to plaintiffs' South Carolina operation totaling $20,067 on the premise that such charge represents depreciation on office equipment, travel, title expense in recording fees, legal and audit expenses, intangibles tax, office supplies, employees' welfare, telephone and telegraph, national association dues, open lot insurance and central office clerk's salary, which are all chargeable to the operation managed by the plaintiffs. The plaintiffs, in rebuttal, argue that since they received no participation in insurance income and participation reserves generated by the South Carolina operation or any other participation in the home office profit, they should not be charged with home office expense. Although defendants admit that these charges were only made for the years 1955 and 1956, they argue that these charges over the entire period of association between the plaintiffs and defendant will amount to a reasonable charge since on this basis these charges would represent on an average only $100 per week for administrative expense. The illogic of this position is that defendant

had no notice of when the association would terminate, and any charge made in 1955 or 1956 could not be predicted for the period of association between plaintiffs and defendant which could occur or, in fact, did occur. Manifestly, the only logical conclusion is that the entire amount of $20,067 as administrative expense was unreasonable, and under the circumstances presented here should not be charged against plaintiffs.

7. Froehde continued to send to the Dunkins quarterly reports and an annual summary for 1956, 1957, 1958 and 1959. These statements showed the financial status of the South Carolina operations. The statements showed that the records were kept in two general accounts, a manager's account (profit and loss statement), and a manager's reserve account. The reserve account was increased at the time of each installment sale by 3% of the difference between the sales price and the downpayment. For accounting purposes, nothing was ever charged against this account and it ultimately grew to $107,809.23. The manager's account showed the profit and loss status of the operation. All repossessions were reflected in this account, and any gain or loss on a repossession was added to or charged against that account. Ultimately, such account showed a loss or overdraft by M. L. Dunkin in the amount of $115,914.77, as represented by the final accounting by the defendant corporation, leaving a net balance due by plaintiffs to defendant of $8,105.54 upon two said accounts.

8. As of August 31, 1958, the sales agreement between Froehde and the Dunkins was terminated by mutual agreement. To wind up the business it was necessary to liquidate repossessions. After August 31, 1958, M. L. Dunkin continued to handle repossessions in the South Carolina area and up until June of 1959 had sold sixty-five repossessed units. He still had fifty-one on hand and was repossessing units faster than he could sell them at retail. It was agreed between Dunkin and Froehde that an auction be held, which was staged the latter part of June, 1959. All fifty-one trailers were sold; three of these were bid in by the defendant for its account and these were left with plaintiffs for sale. Plaintiffs shortly thereafter acquired another trailer by repossession. These four units of the total value of $8,867 were sold by the plaintiffs and no accounting was made by the plaintiffs to the defendant. This represents one element claimed in defendant's counterclaim.

9. Consistent with the Manager's Reserve Agreement the plaintiffs had a right to purchase repossessions at the net payoff figure on the mobile homes. Plaintiffs exercised this right in acquiring the four mobile homes mentioned above at the net payoff thereof of $8,867.00.

10. Except for the three trailers acquired by the plaintiffs at the auction of June 1959 and the one acquired by them shortly thereafter, plaintiffs never exercised their option to purchase any of the additional repossessed trailers at the net payoff figure, and the record substantiates plaintiffs' claim that they were never thereafter properly notified of the repossessions so that they could exercise their purchase rights provided in the Manager's Reserve Agreement. Consequently it is only just and equitable that they not be charged with any of the losses therefrom which in fact was charged to the plaintiffs by the defendant's accounting in the amount of $7,414.84. Although by the Manager's Reserve Agreement plaintiffs had the option to purchase any repossessions plaintiff M. L. Dunkin testified that after June of 1959 that the plaintiffs were not advised of repossessions. The only favorable testimony to the defendant is that of Mr. Heatter, treasurer of the corporation, who could only say that the plaintiffs were "supposed" to be notified by one of the clerks in the office, there being no direct evidence that such notice was in fact given plaintiffs.

11. Plaintiffs contend that the charge for losses incurred after September 1958 in the amount of $20,694.82 should not

be charged to them. Plaintiffs' position is that although they were to receive 50% of the net profits, there was no agreement for them to bear 50% of the losses which might occur. Furthermore, they assert that there was no relationship between the parties after September 1958 which would allow for the charging of a loss. Such a construction is unrealistic. While the agreement may only anticipate profits by application, it must necessarily also contemplate losses although not specifically stated by the parties. The same treatment for losses as profits must necessarily be implied as representing the intention of the parties.

12. In recapitulation:

a. The defendant erroneously charged administrative expenses in the total amount of $20,067 to the account of the plaintiffs. Additionally defendant charged plaintiffs with repossession losses after June 1, 1959 in the sum of $7,414.84, which under the circumstances should not have been charged against plaintiffs. Therefore the court concludes that a total of $27,481.84 was improperly charged against plaintiffs' account, which they should recover from defendant.

b. Since plaintiffs' objections are based upon the defendant's accounting, the final accounting made by the defendant must be accepted by the plaintiffs, since they have not presented evidence to refute defendant's claim in this regard, and the overdraft of $8,105.54 as set forth in paragraph 7 above must be charged against the plaintiffs. Additionally the net payoff value of the four trailers in the sum of $8,867.00 found to have been purchased by the plaintiffs under the Manager's Reserve Agreement as alleged by the defendant in its counterclaim should also be charged against the plaintiffs. Therefore, the court finds the total amount owing to defendant by plaintiffs is the sum of $16,972.54.

Thus, reducing the amount of $27,481.84 owing to the plaintiffs by defendant by the amount of $16,972.54 owing to the defendant by the plaintiffs leaves a net balance due plaintiffs of $10,509.30.

## CONCLUSIONS OF LAW

■ The court has jurisdiction of the parties and the subject matter of this action. It is also clear that the defendant's objection to the reference of this case to the Master is without merit as the relationship of the parties and the complication of the issues made it one which was properly referable, and it is within the equity jurisdiction of the court. See Nickles v. Miller, 116 S.C. 288, 108 S.E. 90 (1921); Zickel v. Knell, 357 Mo. 678, 210 S.W.2d 59, 3 A.L.R.2d 1304 (Mo.1948).

■ After careful consideration of the record before the Master, the court concludes that the Master's Report recommending judgment for the plaintiffs in the amount of $49,082.00 is clearly erroneous, and is not substantiated by the evidence. After evaluation of the competent evidence contained in the record the court concludes:

a. That defendant is indebted to plaintiffs in the total sum of $27,481.84 as a result of improper charges against plaintiffs' account. (See paragraph 12(a) above.)

b. That plaintiffs are indebted to defendant in the total sum of $16,972.54, as set forth in paragraph 12(b) above.

c. That defendant is indebted to plaintiffs in the net sum of $10,509.30, and plaintiffs should be awarded judgment for said amount. It is, therefore,

Ordered that the plaintiffs shall have judgment against the defendant in the sum of $10,509.30 and the costs of this action.

Let judgment be entered accordingly.